```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
ABRAHAM "AVI" MIRMAN,

          Plaintiff,

     v.

EXECUTIVE RISK INDEMNITY, INC.,
                                            18-Civ-1405 (DAB)
          Defendant.                        MEMORANDUM AND ORDER


------------------------------------------X
```
DEBORAH A. BATTS, United States District Judge

Plaintiff Abraham "Avi" Mirman ("Mirman") brings this suit against Defendant Executive Risk Indemnity, Inc. ("ERI") for costs of his defense in a Securities and Exchange Commission ("SEC") investigation and lawsuit. For the reasons set forth below, Mirman's Motion for Summary Judgment is DENIED and ERI's Cross Motion for Summary Judgment is GRANTED.

I.   BACKGROUND

The following facts are undisputed unless otherwise indicated.

A.   The Policy

("ERI") issued a directors and officers liability policy (the "Policy"), Policy Number 8210-8209, to John Thomas Financial

("JTF"). (Def.'s Reply to Pl.'s SOUF[1] ¶ 1, ECF No. 28.) The Policy covers claims made during the policy period from October 6, 2012 through October 6, 2013 (the "Policy Period"). (Id. ¶ 2.) The Policy lists various types of coverage under the Policy including, "Directors and Officers Liability" and "Miscellaneous Professional Liability," among others. (Def.'s Supp. SOUF ¶ 1, ECF No. 29.) Of those, JTF only purchased the "Directors and Officers Coverage Liability."[2] (Id. at ¶ 2.)

The Directors and Officers Liability Coverage Section ("D&O Coverage") lists four insuring clauses. Of those, the operative[3]

---

[1] SOUF hereinafter refers to "Statement of Undisputed Facts."

[2] The Parties do not dispute that the Policy lists various liability coverage sections with check boxes next to each indicating whether that type of coverage has been purchased by the insured. (Mirman Aff. Ex. 2 ("Policy") at MIRMAN0000009, ECF No. 21-5.) The Parties dispute whether JTF was given the option to purchase these various types of coverage. (Pl.'s Reply to Def.'s Supp. SOUF ¶ 1, ECF No. 39.)

[3] In addition, there are three other insuring clauses including the "Individual Indemnified Liability Coverage," "Corporate Liability Coverage," and "Securityholder Derivative Demand Coverage." The Securityholder Derivative Demand Coverage, or Insuring Clause D, states in relevant part:

> The Company shall pay Investigative Costs on behalf of the Insured Organization resulting from any Securityholder Derivative Demand first made during the Policy Period, or any applicable Extended Reporting Period, for Wrongful Acts in an amount not to exceed $100,000, which amount is part of and not in addition to the applicable Limit of Liability as set forth in Item 4 of the Declarations and no Deductible Amount shall apply to such amount.

(Policy at MIRMAN0000040 (alterations omitted).)

insuring clause is Insuring Clause A, "Individual Non-Indemnified Liability Coverage," which states:

> The Company shall pay Loss[4] on behalf of the Insured Persons resulting from any D&O Claim first made against such Insured Persons during the Policy Period, or any applicable Extended Reporting Period, for Wrongful Acts[5], but only to the extent the Insured Organization does not indemnify the Insured Persons for such Loss.

(Mirman Aff. Ex. 2 ("Policy") at MIRMAN0000040 (alterations omitted), ECF No. 21-2.)

It is undisputed that JTF is an "Insured Organization" as defined in the Policy. (Def.'s Reply to Pl.'s SOUF ¶ 9.) During the Policy Period, Mirman was a registered representative and head of Investment Banking at JTF responsible for: (i) originating investment banking, corporate finance, syndicate, equity institutional sales and financial advisory business for JTF's Investment Banking and Capital Markets Department, (ii) servicing the Department's clientele, (iii) supervising and overseeing all aspects of the Department's business and activities and (iv) supervising all Department personnel. (Id. ¶ 19.) It is undisputed that Mirman was an "Employee" of JTF and is therefore an "Insured Person" as defined in the Policy. (Id. ¶ 20.)

---

[4] In the Policy, "Loss" includes "damages, judgments, settlements, pre-judgment interest and [d]efense [c]osts." (Policy at MIRMAN0000042.)

[5] The Policy defines "Wrongful Act" as "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by" an insured person. (Policy at MIRMAN0000043.)

The D&O Coverage also contains several exclusions. The General E&O Exclusion or Professional Services Exclusion which was amended through Endorsement states that:

> "[N]o coverage will be available under the Coverage Section . . . for any D&O Claim based upon, arising from, or in consequence of any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted or allegedly committed or attempted in connection with the rendering of, or actual or alleged failure to render, any professional services for others by any person or entity otherwise entitled to coverage under the Coverage Section identified above."

(Policy at MIRMAN0000052.) The Policy does not define "professional services." (Def.'s Reply to Pl.'s SOUF ¶ 16.)

The Policy provides that the ERI "shall have the right and duty to defend any Claim covered by [the] Policy," even if "any of the allegations are groundless, false, or fraudulent." (Id. ¶ 11.)

B.   The SEC Investigation and SEC Action

The SEC began a formal investigation (the "SEC Investigation") into trading in the stock of a Canadian mining company called Liberty Silver Corporation ("Liberty Silver"). On October 19, 2012, the SEC filed a Formal Order of Investigation captioned "In the Matter of Liberty Silver, NY-8844" (the "Order").[6] (Def.'s Reply to Pl.'s SOUF ¶ 21; See Mirman Aff. Ex. 3

---

[6] The Parties dispute when Mirman actually received the Order. (Def.'s Reply to Pl.'s SOUF ¶ 21.) The Order is dated October 19, 2012 but ERI concedes that the Order was sealed and may have been provided to Mirman only in or about May 2013. (Id.) Mirman contends that he only received the Order in or about May 2013. (Id.)

4

("Order"), ECF No. 21-3.) Both JTF and Mirman received subpoenas in January of 2013 from the SEC in connection with this investigation. (Id.; See Mirman Aff. Exs. 4, 5, ECF Nos. 21-4, 21-5.) The Order states that Liberty Silver's shares may have been involved in improper trading activity in violation of the Securities Act of 1933 and the Securities Exchange Act of 1934. (Def.'s Reply to Pl.'s SOUF ¶¶ 22-23.) The Order does not specifically name JTF or Mirman.[7] (Def.'s Supp. SOUF ¶ 4; Pl.'s Reply to Def.'s Supp. SOUF ¶ 4). The SEC Subpoena served on Mirman (the "Subpoena") requested "[a]ll documents, communications and records of communications with or concerning Liberty Silver, BG Capital, or Robert ('Bobby') Genovese in [Mirman's] personal possession . . ." (Pl.'s Reply to Def.'s Supp. SOUF ¶ 5.) The Subpoena did not identify Mirman as a target of the investigation. (See Mirman Aff. Ex. 4 ("Subpoena"), ECF No. 21-4.)

On or about August 1, 2017, the SEC initiated a lawsuit against Robert Donald Bruce Genovese ("Genovese"), B.G. Capital Group, Ltd. ("BGC"), and Mirman, captioned SEC v. Robert Donald Bruce Genovese, et al., No. 17-cv-5821, in the Southern District of New York (the "SEC Action"). (Def.'s Reply to Pl.'s SOUF ¶ 24.) In the SEC Action, the SEC alleged that Genovese and BGC

---

[7] The Order describes an investigation into "Liberty Silver, its officers, directors, employees, partners, subsidiaries, shareholders and/or affiliates and other persons or entities..." (Pl.'s Reply to Def.'s Supp. SOUF ¶ 4.) It is disputed whether Mirman and JTF are the "other persons" identified in the Order. (Id.)

perpetrated "a penny stock promotion, manipulation and unlawful distribution scheme . . . in the late summer and early fall of 2012, involving the stock of [Liberty Silver.]" (Id. ¶ 25.) The SEC further alleged that "Mirman aided and abetted Genovese's and BGC's fraudulent sales, and acted directly to unlawfully distribute at least part of Genovese's and BGC's [Liberty Silver] shares." (Id.)[8] Allegedly, Mirman "agreed to help Genovese sell his [Liberty Silver] securities and assist his promotion by encouraging JTF customers to buy [Liberty Silver]" in return for a percentage of the proceeds of these sales. (Id. ¶ 26.) Mirman allegedly earned profits of over $300,000.00 from commissions on the sale of Liberty Silver shares through JTF. (Id. ¶ 27.)

In furtherance of this scheme, Mirman allegedly helped negotiate a $2 million "loan" from BGC to JTF's holding company for which he stood to receive a substantial commission; introduced Genovese to the JTF sales floor as his client; arranged and assisted Genovese with presentations to JTF brokers about Liberty Silver; drafted a document for JTF brokers to help solicit their customers to purchase Liberty Silver shares; failed to disclose that Genovese had a beneficial ownership in Liberty Silver's shares; circulated a promotional video about Liberty Silver which was forwarded to JTF's sales force; opened an account for Genovese

---

[8] (See Mirman Aff. Ex. 6, ECF No. 21-6.)

(the "Genovese Account") at JTF in BGC's name so that Genovese could sell a large block of Liberty Silver shares through it; became the representative of record for the Genovese Account entitling him to substantial commission. (Id. ¶¶ 26, 31, 32, 33, 35, 36, 37.)

The SEC further alleged that Mirman "made it falsely appear that [Liberty Silver] was a reporting company under Commission regulations with an applicable six month holding period pursuant to Rule 144." (Id. ¶ 42.) The SEC alleged that:

> "Mirman had to provide his own representations in the form of a Broker's Representation Letter. In the Broker's Representation Letter Mirman executed, he affirmed that he had read the representations in Look Back's Seller's Representation Letter and confirmed his role as a broker under the Securities Act. However, he falsely attested to the following representation: 'After reasonable inquiry, the undersigned is not aware of any circumstances indicating that [Look Back] is an underwriter with respect to the transaction or that the sale is part of a distribution of securities of the issuer.'"

(Id. ¶ 40.)

On or about February 2, 2018, Mirman moved to dismiss the SEC Action. (Def.'s Supp. SOUF ¶ 16.) The District Court denied it entirely. (Id. ¶ 17.) In denying his Motion, the District Court found that "the SEC's allegations establish that Mirman was 'actively involved' and 'compensated for his role' in the sale of Liberty Silver shares" and that "the SEC's allegations establish that by opening and maintaining Genovese's brokerage accounts, signing the Broker's Representation Letter, and arranging and

7

assisting Genovese with presentations to his brokers, Mirman 'associated himself' with Genovese's venture." (Id. ¶¶ 18, 19.) Accordingly, the District Court found that the SEC "sufficiently alleged" Mirman's liability. (Id.)

### C. The Claim

Mirman notified ERI of the SEC Investigation and Action. (Compl. ¶ 27, ECF No. 1.) It is undisputed that the SEC Investigation began during the Policy Period and that the subsequent Action, though filed many years after the Policy Period, is a "Related Claim"[9] as defined in the Policy. (See Def.'s Mem. at 10.) ERI denied coverage, including for defense costs, for the SEC Investigation and SEC Action raising two defenses: that coverage is barred by the Professional Services Exclusion and that coverage is barred by the Securities Claim Exclusion.[10] (Compl. ¶¶ 28, 29, 32).

---

[9] The Policy provides that "[a]ll Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made[.]" (Def.'s Reply to Pl.'s SOUF ¶ 13.)  In addition, the Policy defines "Related Claims" as "Claims for Wrongful Acts based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." (Id. ¶ 14.)

[10] Exclusion (A)(9) or the "Securities Claim Exclusion" excludes coverage for any Claim "based upon, arising from, or in consequence of the actual or alleged violation of any Securities Laws," but does not apply to any Claim "based upon or arising out of the offering, sale or purchase of securities, whether debt or equity, in a transaction or a series of transactions that are in fact in law exempt from registration under the Securities Act of 1933 and any amendments thereto or any rules or regulations promulgated thereunder[.]" (Def.'s Reply to Pl.'s SOUF ¶¶ 17, 18).

On February 16, 2018, Mirman filed the Complaint in the instant case alleging that ERI breached its contractual duty to defend Mirman in the SEC Investigation and Action and seeking declaratory relief of the same.

On June 15, 2018, Mirman filed the instant Motion for Summary Judgment. (ECF No. 20.) On July 27, 2018, ERI Cross-Moved for Summary Judgment. (ECF No. 26.)

## II. Legal Standard for Summary Judgment

A court should grant summary judgment when there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). Genuine issues of material fact cannot be created by conclusory allegations. Victor v. Milicevic, 361 F. App'x 212, 214 (2d Cir. 2010). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a nonmovant, no reasonable juror could find in favor of that party. Melendez v. Mitchell, 394 F. App'x 739, 740 (2d Cir. 2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff." Id. (citation omitted). The non-movant may not rely upon speculation or conjecture to overcome a motion for summary judgment. Burgess v. Fairport Cent. Sch. Dist., 371 Fed. App'x 140, 141 (2d Cir. 2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Unsupported allegations in the pleadings thus cannot create a material issue of fact. Id.

III. Analysis

   A.   Applicable Insurance Law

"Insurance policies are . . . subject to principles of contract interpretation." Nomura Holding Am., Inc. v. Fed. Ins. Co., 45 F. Supp. 3d 354, 363 (S.D.N.Y. 2014) (citations omitted). "Under New York law,[11] the interpretation of a contract 'is a matter of law for the court to decide.'" Id. (quoting Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir.

---

[11] It is undisputed that New York law applies.

2002)). When insurance contracts contain an exclusion provision, "[t]he insurer generally bears the burden of proving that the claim falls within the scope of [the] exclusion ... [by] establish[ing] that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." Id. (internal quotation marks and citations omitted) (alterations in original).

An insurer with a duty to defend must provide or pay for its insured's defense unless it can "cast the pleading solely and entirely within the policy exclusions." Seaboard Surety Co. v. Gillette Co., 476 N.E.2d 272, 276 (N.Y. 1984) (citations omitted). Where no cause of action could be proved but-for conduct excluded by the policy, an insurer has no obligation to defend or indemnify. Beazley Ins. Co., Inc. v. ACE American Ins. Co., 880 F.3d 64, 71 (2d Cir. 2018).

B.  ERI Has No Duty to Defend Mirman.

ERI has no duty to defend Mirman in the SEC Investigation or Action because no cause of action against him can be sustained but for the conduct excluded by the Professional Services Exclusion ("PS Exclusion").[12]

---

[12] Having decided that coverage is precluded under the PS Exclusion, we do not decide whether coverage is also precluded under the Securities Law Exclusion.

11

To invoke the PS exclusion successfully,[13] ERI must demonstrate that the Claim for the SEC Investigation and Action arose out of Mirman's "rendering of, or actual or alleged failure to render, any professional services." When "professional services" is not defined in the policy, as is the case here, New York courts have held that "the question of whether one is engaged in a professional service depends on whether those individuals acted with the special acumen and training of professionals when they engaged in the acts." Beazley, 880 F.3d at 71 (quoting David Lerner Assocs., Inc. v. Phila. Indem. Ins. Co., 934 F. Supp. 2d 533, 541 (E.D.N.Y. 2013) (internal quotation marks and alteration omitted)). Moreover, New York courts "[look] to the nature of the conduct under scrutiny rather than the title or position of those involved, as well as to the underlying complaint" to determine whether one is engaged in a professional service. Id.

Mirman's conduct as alleged by the SEC required the "special acumen and training" of professionals in the securities industry. The SEC alleged that Mirman stood to receive commissions both for

---

[13] The Parties do not dispute that the SEC Action is a proper Claim under Insuring Clause A. (See Def.'s Mem. 12-13.) However, ERI disputes that the SEC Investigation was a proper Claim within the meaning of Insuring Clause A because Mirman was not the "target" of the investigation, nor was he accused of a "Wrongful Act" in the SEC Subpoena. (Id. 11-12.) On the other hand, Mirman argues that he and JTF were "other persons" identified as targets of the investigation in the Order and therefore the SEC investigation is a proper Claim under Insuring Clause A in its entirety. (See Pl.'s Reply to Def.'s Supp. SOUF ¶ 4.) We do not reach a decision on whether Insuring Clause A offers coverage over the SEC Investigation because we conclude that even if it does, coverage would be precluded by the Professional Services Exclusion.

negotiating a $2 million loan for JTF's holding company and for opening the Genovese Account for which he became a representative. Effecting these transactions for the account of others, specifically JTF, his employer, and Genovese, requires training, registration, licensing, and compliance with state and federal laws. See, e.g., S.E.C. v. Martino, 255 F.Supp.2d 268, 283 (S.D.N.Y. 2003) (quoting provisions of the Exchange Act that formally define "broker" and require that brokers be registered with the SEC before engaging in securities transactions on behalf of others). In addition, Mirman did or stood to receive substantial commissions in exchange for effecting these transactions as compensation for his professional services.

Moreover, the SEC also alleged that Mirman prepared and signed a Broker's Representation Letter falsely stating that Liberty Silver was a reporting company under SEC regulations. In that Letter, Mirman "confirmed his role as a broker registered under the Securities Act." Knowing when an entity is (or is not) a reporting company under SEC regulations requires a broker to use his specialized training and acumen.  In that letter, he further attested that he is not aware that "[Look Back] is an underwriter with respect to the transaction or that the sale is part of a distribution of securities of the issuer." Knowing when an entity is (or is not) an underwriter in a transaction or whether a sale is part of a distribution of securities of the issuer goes beyond

13

a lay person's knowledge and skill, requiring the broker to use his special acumen and training. It is precisely because such affirmations require specialized knowledge and training that Mirman had to attest to his role as a broker registered under the Securities Act. Again, Mirman's conduct unmistakably constituted "professional services" because he used his special acumen and training as a broker.[14]

Our inquiry does not stop there. To invoke the PS Exclusion successfully, ERI must also show that the Claim could not succeed "but for" the rendering of Mirman's professional services. Beazley, 880 F.3d at 71 ("[I]f the plaintiff in an underlying action . . . alleges the existence of facts clearly falling within . . . an exclusion, and none of the causes of action that he or she asserts could exist but for the existence of the excluded activity or state of affairs, the insurer is under no obligation to defend the action." (quoting Scottsdale Indem. Co. v. Beckerman, 120 A.D.3d 1215 (2d Dep't 2014)).

Here, the causes of action alleged against Mirman in the SEC Action cannot be sustained but for the rendering of Mirman's

---

[14] Mirman's insistence that he didn't use his special acumen or training fails. Mirman argues that any actions he took on behalf of Genovese are primarily "introductions" that do not constitute professional services. However, Mirman cherry-picks only those actions which make him appear unskilled. He ignores all those actions he took that could only be accomplished with his specialized knowledge and training. Notwithstanding Mirman's bleak view of his own training and acumen, the majority of the conduct alleged constituted professional services as discussed above.

professional services. The SEC alleged that "Mirman aided and abetted Genovese's and BGC's fraudulent sales, and acted directly to unlawfully distribute at least part of Genovese's and BGC's Liberty Silver shares." The allegations supporting these charges are that Mirman opened and acted as the representative for the Genovese Account, introduced Genovese to other JTF brokers as his client, drafted and signed the Broker's Representation Letter on Genovese's behalf, received brokerage commissions from the sale of stock in the Genovese Accounts, and received a substantial commission from Genovese for negotiating the loan to JTF from BGC. These allegations, which we already concluded constitute professional services rendered, form the factual basis of the SEC's charges against Mirman.

Moreover, the District Court's denial of Mirman's Motion to Dismiss the underlying SEC Action relies on the very professional services discussed above. In denying Mirman's Motion, the District Court considered the SEC's allegations of Mirman's professional services rendered for Genovese and BGC, concluding that Mirman was "actively involved" and "compensated for his role" in the sale of Liberty Silver shares and that the SEC "sufficiently allege[d] Mirman's aiding and abetting liability." The District Court thus confirms that Mirman's professional services form the basis of the charges against him without which the SEC's charges would not have survived the Motion to Dismiss.

Because Mirman rendered professional services within the "clear and unmistakable language" of the PS Exclusion and because the causes of action against Mirman cannot be sustained but for the rendering of these professional services, ERI has no obligation, as a matter of law, to defend Mirman in either the SEC Investigation or Action.[15]

---

[15] Mirman also argues that relying on the PS Exclusion to deny coverage would render coverage illusory. J.P. Morgan Sec. Inc. v. Vigilant Ins. Co., 51 N.Y.S.3d 369, 378 (N.Y. Sup. Ct. 2017), amended, (N.Y. Sup. Ct. Aug. 7, 2017) (explaining that New York law requires that insurance policy exclusions be construed narrowly so as to not render coverage illusory). No doubt, applying but-for causation in a PS Exclusion when the insured's business model centers on the provision of professional services, excludes many, if not all, claims that the insured could possibly face possibly rendering coverage illusory. Accord Strategic Forecasting, Inc. v. Scottsdale Indem. Co., No. 12-cv-2015, U.S. Dist. LEXIS 174706, *15 n. 3 (E.D.N.Y. Sept. 30, 2015). Mirman argues that his coverage under Insuring Clause A is thin if not wholly illusory because his role as a registered representative of JTF is, in large part, providing professional services. On the other hand, ERI argues that the D&O Coverage purchased by JTF is designed to protect directors and officers against claims by stakeholders (typically creditors and shareholders) that bad management damaged their investment. If JTF wanted its employees to have coverage for Claims arising from their rendering of professional services, it could have purchased a separate and distinct product, Miscellaneous Professional Liability Coverage ("MPL Coverage"), designed to protect employees (including directors and officers) from liability originating from the professional services they render.

We agree with ERI and decline to render an entire line of insurance worthless. First, we cannot shrink the scope of the PS Exclusion under New York law because the Exclusion is stated in "clear and unmistakable language, is subject to no other reasonable interpretation," 45 F.Supp.3d at 363, and Mirman's conduct falls within this Exclusion. Second, even if we could shrink the scope of the PS Exclusion in this specific instance, it is not necessary because the Policy's coverage is not wholly illusory. ERI indeed offers MPL Coverage as a product which JTF could have separately purchased. Even though there is dispute about whether JTF was given the option to purchase MPL Coverage, it is undisputed that MPL Coverage exists, is offered by ERI, and is listed as an option in the very Policy issued to JTF. (See Policy at MIRMAN0000009.)

Moreover, our analysis is focused on Insuring Clause A pursuant to which the Claim was filed; however, D&O Coverage provides coverage under other insuring clauses. Of those, Insuring Clause D indemnifies the insured from investigative costs arising from Securityholder Derivative Demand and is not subject to the PS Exclusion. Thus, D&O Coverage does cover some costs arising from Securityholder Derivative Actions even when they arise from the rendering of professional services. This is consistent with ERI's argument that D&O Coverage is designed primarily to protect directors and officers against claims by stakeholders that bad management damaged their investment.

## IV. CONCLUSION

For the aforementioned reasons, ERI's Cross-Motion for Summary Judgment is GRANTED and Mirman's Motion for Summary Judgment is DENIED in its entirety. ERI has no duty to indemnify Mirman for defense costs relating to the SEC Investigation or SEC Action as a matter of law.

The Clerk of Court is directed to enter judgment for Defendant Executive Risk Indemnity, Inc. and close the docket in this case.

SO ORDERED.

Dated:   May 16, 2019
         New York, New York

_____
Deborah A. Batts
United States District Judge

---

Finally, the Policy is a standard-form contract meaning it could be purchased by insureds whose business models are not centered on the provision of professional services. For those insureds, Insuring Clause A would provide substantially more coverage than it does here. If we shrank the scope of the PS Exclusion to fit this specific instance where the insured's business model is wholly-centered on rendering professional services, then we would expand the D&O Coverage to include MPL Coverage for all insureds. It would, in effect, render the separate and distinct line of MPL Coverage insurance worthless in most circumstances. We are not willing to go that far.